Horace CASE, Appellant,

v.

Arthur E. MORRISETTE.

No. 22810.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 12, 1970.

Decided Feb. 27, 1973.

Richard J. Hopkins, Washington, D. C., for appellant.

Joel C. Wise, Washington, D. C., with whom Roger Peed, Washington, D. C., was on the brief, for appellee.

Before TAMM, ROBINSON and Mac-KINNON, Circuit Judges.

**SPOTTSWOOD W. ROBINSON, III,** Circuit Judge:

The sole question presented for our decision is whether an owner of property in a subdivision acquired a right to park vehicles on a lot which an inscription on a revised copy of the subdivision plat, annexed to a declaration of covenants and referred to in the grantee's deed, indicated had been set aside for that purpose. The District Court, on facts not materially in dispute, answered that question in the negative, and entered judgment against the plaintiff-owner. This appeal challenges the legal conclusions the court drew from the facts and the validity of the judgment which the court was thus led to pronounce.

We would be less than candid if we did not mention at the outset that we have encountered a number of difficulties which we should not have been required to solve. We have found omissions from the record of information which would have greatly simplified our review. We have, in some instances, been confronted with questions which neither side has addressed, and in others with positions assumed without factual support and contentions advanced without citation of authority or even supporting reasoning.[1] This has compelled us to expend a great deal of time and effort which otherwise could have been avoided.

Our own investigation into this case has involved a thorough analysis of the record and painstaking examination of relevant bodies of legal doctrine in order to deal adequately with the manifold problems uncovered. On the basis of our study, we conclude that the trial judge clearly erred in the disposition which he made. Accordingly, we reverse the judgment appealed from and remand for further proceedings.

I

Dexter Heights, in Southeast Washington, was developing during World

---

1. We make specific reference in this opinion to some of these difficulties.

War II as a subdivision of 89 lots with apparently a nearly equal number of residential units. Throughout the remainder of the war, the subdivider, Dexter Realty Company, rented these units to persons engaged in the defense effort; thereafter the units, with the lots on which they were built, were sold individually to returning veterans. In 1949, Horace Case, the appellant, came into the ownership of Lot 44–0 in Square 5869, improved by the dwelling numbered 1349 Talbert Terrace, Southeast, in which he continues to reside.[2] The parcel sprouting this litigation—Lot 43 in Square 5869—also abuts Talbert Terrace and is wholly unimproved. A revision of a portion of the original subdivision plat of Dexter Heights, on which revised plat the layout of the 89 lots and other features are depicted,[3] is attached to and recorded with a declaration of covenants imposing use restrictions uniformly on the subdivided properties.[4] In the written declaration, all lots are identified by reference to their lot and square numbers as shown on the revised plat appended.[5]

The written declaration makes no mention of a servitude on Lot 43—the allegedly encumbered lot—for vehicular parking. In regard to Lot 43, the declaration refers to the revised plat and states that it is subject to a building line restriction shown thereon, and to a recorded agreement between the subdivider and the District of Columbia concerning water and sewer connections and party walls.[6] The annexed copy of the revised subdivision plat, however, bears, within the boundaries it marks for Lot 43, an inscription reading "To be Grad-

2. Case bought, not directly from Dexter Realty Company or its corporate successor, but from an intermediate purchaser. The property was conveyed to Case and his wife as tenants by the entireties, and Case has litigated alone in the District Court and here. The record gives no explanation for the absence of the wife as a party. Since the point has nowhere been raised, we do not pause to explore its implications.

3. For the sake of clarity, we point out now several important facts which we later discuss in more detail. The original plat of the subdivision of Dexter Heights is duly recorded in the office of the Surveyor of the District of Columbia, and the revised plat referred to in text is recorded with the declaration of covenants in the office of the Recorder of Deeds of the District of Columbia. See text *infra* at notes 49–51. The inscription on which Case relies appears on the revised plat, see text *infra* at note 7, but on the record before us we must assume that it does not appear on the original plat filed with the Surveyor. See text *infra* following note 53. Statutes in the District of Columbia in terms require recordation of subdivision plats in the Surveyor's office and forbid their recordation in the Recorder of Deed's office, see text *infra* at notes 50–51, thus jeopardizing the recordation of the revised plat as constructive notice of the inscription it contained to subsequent purchasers. A crucial question, then, is whether the recording treatment given the inscription affects its enforceability. See Part III, *infra*. Another question is whether in any event the inscription imposed the servitude for parking which Case contends for in this case. See Part IV, *infra*.

4. The restrictions apparently remain in full force. The declaration specifies that they would endure until January 1, 1968, and would then be automatically extended for successive periods of ten years unless by vote of a majority of the then property owners it should be agreed to change them in whole or in part. The record does not inform us as to whether there has been any vote to change.

5. The declaration states that "[a]ll the . . . lots [are] more fully designated and shown on plat attached hereto and made a part hereof and to which reference is hereby made. . . ."

6. As we have stated, the residential units were built with a view to immediate rental to defense workers and ultimately to sale to veterans. The units were constructed as row houses in groups of six, originally with six-inch nonbearing partitions and in some instances with a common sewer and a common water supply. By the agreement referred to in text, Dexter Realty Company covenanted with the District of Columbia to bring all party walls into compliance with building regulations and to provide separate sewer and water connections prior to any conveyance of the units as separate properties.

ed & Cinder Covered for Car Parking (50 cars) Provide Driveway Entrance from Talbert Terrace."[7] Lot 43 has never been graded, cinder-covered or furnished a driveway entrance from Talbert Terrace. It has never been used for parking, and without grading and a driveway entrance it could not be so used.

In 1963, the corporate successor to Dexter Realty Company conveyed Lot 43 to Arthur L. Morrisette, the appellee. The deed to Morrisette characterizes Lot 43 as "comprising the area for car parking . . . as shown on the" copy of the revised subdivision plat recorded with the declaration of covenants.[8] Morrisette proposes to develop Lot 43 for parking, not by residents of Dexter Heights, but by tenants of an apartment complex he plans to construct on adjacent land.[9]

It was to prevent Morrisette from doing so that Case brought suit in the District Court.[10] He claimed that the inscription on the revised subdivision plat in regard to Lot 43 [11] gave rise to a right appurtenant to the other properties comprising Dexter Heights to use Lot 43 for parking to the extent of 50 cars. On this theory Case sought a judgment declaratory of that right, an injunction restraining Morrisette from interfering with it, and a mandatory injunction compelling Morrisette to grade and cinder-cover Lot 43 and provide it with an entrance driveway from Talbert Terrace. Morrisette, advancing several defenses, asserted primarily that the inscription did not confer any such interest in Lot 43 upon other property owners in Dexter Heights.[12] The District Court, after a trial without a jury, rendered judgment in favor of Morrisette, and this appeal followed.

II

Upon completion of the evidentiary and argumentative presentations, the trial judge orally announced his decision and his reasons therefor, and shortly thereafter filed written findings of fact and conclusions of law.[13] The written findings indicate nothing as to the basis for the judge's decision,[14] and only one of the accompanying conclusions is in any wise helpful on that score.[15] That conclusion was that Case had "failed to show that the [d]eclaration . . . grants to him or other lot owners in the subdivision . . . any right, title, or interest in . . . Lot 43. . . ."

Some additional and much needed enlightenment is derived from the judge's statement at the end of the trial.[16] The question, said the judge, was whether

---

7. As we shall see, this inscription is the focal point of the litigation.

8. The deed also refers to the original subdivision plat, which we later discuss. See text *infra* at notes 50–59.

9. See Fields v. District of Columbia, 143 U.S.App.D.C. 325, 443 F.2d 740 (1970).

10. Though brought as a class action, Case abandoned that approach in the District Court and requested that the action be treated instead as an individual suit.

11. See text *supra* at note 7.

12. Additional defenses are laches and the statute of limitations. The District Court did not rule on them one way or the other. See, however, text *infra* at notes 97–98.

13. See Fed.R.Civ.P. 52(a).

14. These findings refer only to the parties' lot ownerships, the Dexter Heights subdivision, the declaration of covenants, the

contentions of the parties and the issue as the judge conceived it.

15. The judge's other conclusions relate only to jurisdiction and to the resolution of the case in Morrisette's favor.

16. In relevant part, the judge stated:
The last clause of this legend is ungrammatical and not understood. The question is whether this legend is sufficient to create a parking easement. The declaration itself after describing the property in detail contains a number of covenants running with the land requiring the land to be used only for residential purposes providing for certain setbacks, excluding trailors and so forth. Nowhere in among the covenants is there any mention of a parking area. An easement cannot be created by ambiguous language. The Court is of the opinion that the legend on the plat is purely descriptive and was not intended

the inscription on the revised subdivision plat within the boundaries marked for Lot 43 created an easement for parking.[17] That question the judge answered in the negative for reasons which, as nearly as we can glean, were the following. Firstly, the written declaration of covenants imposed a number of restrictions on the lots comprising Dexter Heights, but did not mention an area set aside for parking.[18] Secondly, Lot 43 has never been used or useable for parking, and the property owners had not asserted any right to have it made suitable for that purpose.[19] Thirdly, "[a]n easement cannot be created by ambiguous language."[20] The last clause of the inscription pertaining to Lot 43—"Provide Proper Driveway from Talbert Terrace"[21]—"is ungram-

matical and not understood."[22] And "the legend on the plat is purely descriptive and was not intended to create an easement or other property rights."[23] Fourthly, no equitable servitude on Lot 43 arose because it was never used for parking.[24]

█ In examining the District Court's decision that property owners in Dexter Heights have no claim on Lot 43, we remain advertent to the consideration that "[f]indings of fact shall not be set aside unless clearly erroneous,"[25] and in that regard we do not distinguish between written and transcribed oral findings.[26] But although the findings "come here well armed with the buckler and shield" conferred by the "clearly erroneous" standard,[27] they do not have the force and effect of a jury verdict.[28]

to create an easement or other property rights. Apparently the parties so understood the matter and assumed that there was no parking easement because the lot is not suitable for parking.

In 1942 it was a precipice. It has never been graded or put in shape for use as a parking lot and has never been used as such and is not now being used as such. The property owners who now claim to have an easement never asserted any rights to have the lot graded and put in shape for parking and never attempted to park any cars thereon. It is quite apparent that there was no intention on the part of either side to create the legend on the plat as a grant of an easement. It cannot be an equitable servitude because it has never been used as such. Apparently the property owners became very much dissatisfied within the past year or so and the fact that the present owners of the tract are planning to build some additional apartments in the immediate area and are objecting to this enterprise. Whether the enterprise is a desirable one or not is something that does not concern the Court. But it does explain why after a quarter of a century some of the property owners all of a sudden began to claim that they had a parking easement in a lot which was and still is a precipice.

17. See note 16, *supra*.

18. See note 16, *supra*.

19. See note 16, *supra*.

20. See note 16, *supra*.

21. See text *supra* at note 7.

22. See note 16, *supra*.

23. See note 16, *supra*.

24. See note 16, *supra*.
25. Fed.R.Civ.P. 52(a).

26. The judge's statement at the end of the trial is transcribed as a part of the record of the trial proceedings. See Amplex of Maryland, Inc. v. Outboard Marine Corp., 380 F.2d 112, 113 (4th Cir. 1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968); Southern Pac. Land Co. v. United States, 367 F.2d 161, 162 n. 1 (9th Cir. 1966), cert. denied, 386 U.S. 1030, 87 S.Ct. 1478, 18 L.Ed.2d 592 (1967). We perceive no inconsistency between the statement and the written findings. See United States v. Cornish, 348 F.2d 175, 181 n. 8 (9th Cir. 1965). See also FTC v. B. F. Goodrich Co., 100 U.S. App.D.C. 58, 63, 242 F.2d 31, 36 (1957).

27. Horton v. United States Steel Corp., 286 F.2d 710, 713 (5th Cir. 1961).

28. Proposals to adopt the limited review of jury verdicts as the standard for trial judges' factual findings were rejected. See 9 C. Wright & A. Miller, Federal Practice § 2571 (1971); Note, Rule 52 (a): Appellate Review of Findings of Fact Based on Documentary or Undisputed Evidence, 49 Va.L.Rev. 506, 511–516 (1963).

To be sure, the findings are presumptively correct [29] and the burden of persuading us that they are "clearly erroneous" rests upon Case.[30] Equally certain it is that we are not to weigh the evidence de novo,[31] or disturb the findings simply because we might have reached a contrary result on the same evidence.[32] And not only must we give "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses," [33] but we must also measure the findings by the "clearly erroneous" test even when they are based on inferences drawn from documents or undisputed facts.[34]

■ On the other hand, a finding is "clearly erroneous" if it is without substantial evidentiary support [35] or if it was induced by an erroneous application of the law.[36] Beyond that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been commit-

29. Coleman v. United States, 85 U.S.App. D.C. 145, 148, 176 F.2d 469, 472 (1949); Fleming v. Palmer, 123 F.2d 749, 751 (1st Cir. 1941), cert. denied, 316 U.S. 662, 62 S.Ct. 942, 86 L.Ed. 1739 (1942); Crowe v. Cherokee Wonderland, Inc., 379 F.2d 51, 53 (4th Cir. 1967); United States v. Stewart, 201 F.2d 135, 137 (5th Cir. 1953).

30. Bellevue Gardens, Inc. v. Hill, 111 U.S. App.D.C. 343, 345, 297 F.2d 185, 187 (1961); Obolensky v. Saldana Schmier, 409 F.2d 52, 54 (1st Cir. 1969); Watson v. Joshua Hendy Corp., 245 F.2d 463, 464 (2d Cir. 1957); R. M. Palmer Co. v. Luden's, Inc., 236 F.2d 496, 498 (3d Cir. 1956).

31. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 381, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); Socash v. Addison Crane Co., 120 U.S.App.D.C. 308, 309, 346 F.2d 420, 421 (1965); Lichter v. Goss, 232 F.2d 715, 719 (7th Cir. 1956).

32. Zenith Radio Corp. v. Hazeltine Research, Inc., supra note 31, 395 U.S. at 123, 89 S.Ct. 1562, 23 L.Ed.2d 129; United States v. National Ass'n of Real Estate Bds., 339 U.S. 485, 495–496, 70 S.Ct. 711, 94 L.Ed. 1007 (1950); B's Co. v. B. P. Barber & Associates, Inc., 391 F.2d 130, 132–133 (4th Cir. 1968); Neal v. Saga Shipping Co., 407 F.2d 481, 487–488 (5th Cir.), cert. denied, 395 U.S. 986, 89 S.Ct. 2143, 23 L.Ed.2d 775 (1969).

33. Fed.R.Civ.P. 52(a); Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 336 U.S. 271, 274–275, 69 S.Ct. 535, 93 L.Ed. 672 (1949); Jackson v. United States, 122 U.S.App.D.C. 324, 326–327, 353 F.2d 862, 864–865 (1965).

34. Advisory Committee Note to Fed.R.Civ. P. 52(a); United States v. United States Gypsum Co., 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948). See, to the same effect, United States v. Singer Mfg. Co., 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963); Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); Graver Tank & Mfg. Co. v. Linde Air Prods. Co., supra note 33, 339 U.S. at 609–610, 70 S.Ct. 854; Bishop v. United States, 96 U.S.App.D.C. 117, 121–122, 223 F.2d 582, 586–587 (1955), judgment vacated and case remanded on other grounds, 350 U.S. 961, 76 S.Ct. 440, 100 L.Ed. 835 (1956).

35. Baltimore & O. R. R. v. Postom, 85 U.S. App.D.C. 207, 208, 177 F.2d 53, 54 (1949); James Julian, Inc. v. President & Comm'rs of Town of Elton, 341 F.2d 205, 209–210 (4th Cir. 1965); Miller v. Commissioner, 203 F.2d 350, 353 (6th Cir. 1953). We do not, however, accept the converse of that proposition. In our view, "substantial evidence" and "clearly erroneous" are not synonomous; although supported by substantial evidence a finding may be set aside if it is found to be clearly erroneous. W.R.B. Corp. v. Geer, 313 F.2d 750, 753 (5th Cir. 1963); Jackson v. Hartford Accident & Indem. Co., 422 F.2d 1272, 1275–1278 (8th Cir. 1970); 5A J. Moore, Federal Practice ¶ 52.03[1], at 2621–2624 (2d ed. 1971); 9 C. Wright & A. Miller, Federal Practice § 2585, at 735; Note, 41 Tex.Law.Rev. 935, 939 (1963).

36. United States v. Singer Mfg. Co., supra note 34, 374 U.S. 194 n. 9, 83 S.Ct. 1173; MacMullen v. South Carolina Elec. & Gas Co., 312 F.2d 662, 670 & n. 7 (4th Cir.), cert. denied, 373 U.S. 912, 83 S.Ct. 1302, 10 L.Ed.2d 413 (1963); Toro Mfg. Corp. v. Jacobsen Mfg. Co., 357 F.2d 901, 902–903 (7th Cir. 1966).

ted."[37] In reviewing the trial judge's decision in this case, then, we must look to all of the evidence of record[38] to determine whether the findings can pass muster. And in making that determination, we also bear in mind that conclusions of law do not find shelter in the "clearly erroneous" requirement.[39]

### III

The core question, as the District Court stated,[40] is whether the inscription made within the area of Lot 43 as marked on the copy of the revised subdivision plat annexed to the declaration of covenants imposed on that lot a servitude in favor of the other lots in Dexter Heights. In approaching a solution to this question, we remember that Case seeks relief by way of a declaration of the right he conceives and an injunction enforcing that right. We need not, then, ponder whether the inscription survives the strictures of the common law as to covenants running with the land for purposes of actions for damages occasioned by breach.[41] The relevant inquiry here is whether the inscription meets the far less onerous prerequisites to equitable enforcement of property servitudes.[42]

Those prerequisites are two in number. The first is a servitude engrafted upon one parcel of land with a view to benefiting one or more other parcels.[43] The second is notice of the servitude, to the party against whom enforcement is sought, at the time he took the burdened parcel.[44] Put another way, an owner of a benefited parcel may enforce such a servitude against the owner of the burdened parcel who acquired it with notice of the servitude.[45] The right of enforcement does not depend upon privity of contract or estate between the parties,[46] or upon whether by the rules of the common law either benefit or burden of the restriction runs

37. United States v. United States Gypsum Co., *supra* note 34, 333 U.S. at 395, 68 S.Ct. at 542. *Accord*, Zenith Radio Corp. v. Hazeltine Research, Inc., *supra* note 31, 395 U.S. at 123, 89 S.Ct. 1562, 23 L.Ed.2d 129; Guzman v. Ruiz Pichirilo, 369 U.S. 698, 702, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962); Commissioner v. Duberstein, *supra* note 34, 363 U.S. at 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218; McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954); United States v. Oregon State Medical Soc., 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

38. United States v. United States Gypsum Corp., *supra* note 34, 333 U.S. at 395–399, 68 S.Ct. 525; Feder v. Martin Marietta Corp., 406 F.2d 260, 264 (2d Cir. 1969); Tanzer v. Huffines, 408 F.2d 42, 45 n. 8 (3d Cir. 1969); Lentz v. Metropolitan Life Ins. Co., 428 F.2d 36, 39 (5th Cir. 1970).

39. United States v. Mississippi Valley Generating Co., 364 U.S. 520, 526, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961); District of Columbia v. Seven-Up of Washington, Inc., 93 U.S.App.D.C. 272, 275, 214 F.2d 197, 200, cert. denied, 347 U.S. 989, 74 S.Ct. 851, 98 L.Ed. 1123 (1954); Caron Corp. v. Ollendorf, 160 F.2d 444, 445 (2d Cir.), cert. denied, 332 U.S. 765, 68 S.Ct. 72, 92 L.Ed. 350

(1947); Automotive Devices Co. v. Automotive Devices Co. of Pennsylvania, 292 F.2d 663, 664 & n. 3 (3d Cir. 1961); Hicks v. United States, 368 F.2d 626, 630–632 (4th Cir. 1966).

40. See note 16, *supra*.

41. See text *infra* at notes 46–47.

42. See text *infra* at notes 43–48.

43. See cases cited *infra* note 45.

44. See cases cited *infra* note 45.

45. Republic Steel Corp. v. Payne, 272 Ala. 483, 132 S.2d 581, 584 (1961); Murphey v. Gray, 84 Ariz. 299, 327 P.2d 751, 755 (1958); Easton v. Careybrook Co., 210 Md. 286, 123 A.2d 342, 344 (1956); Sun Oil Co. v. Trent Auto Wash, Inc., 379 Mich. 182, 150 N.W.2d 818, 821 (1967); Reed v. Williamson, 164 Neb. 99, 82 N.W.2d 18, 27 (1957); Simplex Precast Indus., Inc. v. Biehl, 395 Pa. 105, 149 A.2d 121, 124–125 (1959); Hercules Powder Co. v. Continental Can Co., 196 Va. 935, 86 S.E.2d 128, 134 (1955).

46. Osius v. Barton, 109 Fla. 556, 147 So. 862, 865 (1933); Clem v. Valentine, 155 Md. 19, 141 A. 710, 713 (1928); Reed v. Williamson, *supra* note 45, 164 Neb. 99, 82 N.W.2d at 27; Cheatham v. Taylor, 148 Va. 26, 138 S.E. 545, 547–548 (1927).

with the land.[47] It rests, rather, upon the obvious injustice of permitting one who purchased the burdened parcel with notice of the restriction to frustrate its object.[48]

As we begin our investigation to determine whether Case met these two preconditions, we encounter one of the record deficiencies to which we have previously alluded. The revised plat of Dexter Heights delineating the scheme of the 89 lots which were successively improved, rented and ultimately sold was, as we have said, attached to and constituted a part of the declaration of use restrictions,[49] and that declaration was recorded in the office of the Recorder of Deeds. A copy of the revised plat was admitted into evidence, and witnesses and counsel invariably spoke thereto at trial and in like fashion the arguments presented in this court are addressed to it.

By statute, however, the exclusive legal office for the recording of subdivision plats is the office of the Surveyor of the District of Columbia,[50] and any

recording of such plats in the office of the Recorder of Deeds is made "not . . . lawful."[51] The parties have offered no explanation as to why the copy of the revised plat of Dexter Heights accompanying the declaration of covenants was indulged recordation in the latter office, and the record is barren of any indication that the revised plat was also recorded in the office of the Surveyor.

The documents of title introduced into evidence, however, also refer to another plat of Dexter Heights—a plat indeed recorded in the office of the Surveyor. But no copy of this other plat was proffered at trial, and the trial record thus leaves some of its essential features in the dark. To further complicate the problem, the record gives positive indication that this plat and the revised plat are not identical.[52] From just the little we can gather, it seems rather clear that the plat recorded in the office of the Surveyor shows a subdivision of Dexter Heights into only nine large lots.[53] On the other hand, the copy of

---

47. Coomes v. Aero Theatre & Shopping Center, 207 Md. 432, 114 A.2d 631, 634 (1955) ; Pratte v. Balatsos, 99 N.H. 430, 113 A.2d 492, 494–495 (1955) ; Brenizer v. Stephens, 220 N.C. 395, 17 S.E.2d 471, 472–473 (1941) ; 3 R. Powell, Real Property ¶ 411, at 449–465 (rev. ed. 1970) ; 5 id. ¶ 670, at 141–144, ¶ 671, at 148–149 (rev. ed. 1971) ; 3 H. Tiffany, Real Property § 861, at 487–490 (3d ed. 1939).

48. E. g., Marra v. Aetna Const. Co., 15 Cal.2d 375, 101 P.2d 490, 492 (1940) ; Cole v. Seamonds, 87 W.Va. 19, 104 S.E. 747, 748–749 (1920).

49. See text supra at note 4.

50. "The office of the surveyor of the District shall be the legal office of record of the plats and subdivisions of all private property in the District of Columbia and of all property belonging to the District of Columbia. And the copies of all records of the division of squares and lots made between the public and the original proprietors and all plats, papers, books, maps, and records now in the office of the surveyor shall remain therein." D.C. Code § 1–605 (1967).

51. "It shall not be lawful for any person or persons to record any map or plat of

the subdivision of land in the District of Columbia in the office of the recorder of deeds for said District, whether such map or plat be attached to a deed or other document or is offered separately for record." D.C.Code § 45–506 (1967).

52. The declaration of covenants and the deeds conveying title to Case and Morrisette, respectively, all indicate differences between the plats. See note 53, infra. And while a witness testified that the copy of the revised plat introduced in evidence was a "copy of the original site plan on Dexter Heights," it would appear that he was referring to the revised plat recorded with the declaration, and not to the one recorded in the office of the Surveyor.

53. The declaration of covenants identifies nine lots—the totality of Dexter Heights —by reference to the plat recorded in the Surveyor's office, and states that each of eight of these lots comprises a group of smaller lots—88 in the aggregate—as shown on the revised plat recorded in the Recorder of Deed's office, Lot 43 being the only original lot not further subdivided. The deed to Case specifically identifies the property conveyed by its lot number on the revised plat, and describes it as

the revised plat recorded with the declaration in the office of the Recorder of Deeds—which is before us—unquestionably made a further carving of those lots into a total of 89 new lots. Thus the former emerges as the plat of the original subdivision of Dexter Heights and the latter as a revision—a further subdivision superimposed upon a copy of the original. To add to our woes, there is a complete absence of anything to suggest that the inscription written on the revised plat in regard to Lot 43 is also written on the original plat recorded with the Surveyor. In this state of the record, we must assume that the inscription appears only on the revised plat annexed to the declaration filed in the Recorder of Deed's office, which is referred to in the deed to Morrisette.

So it is that we become confronted with a problem as to whether the notice prerequisite to enforcement of equitable servitudes obtained in this case. The initial question, arising from the statutes governing recordation of subdivision plats in the District, is whether under the circumstances portrayed subsequent purchasers are charged with constructive notice of plats filed with the Recorder of Deeds, and thus are not permitted to rely upon the representations implicit in plats recorded with the Surveyor. The parties have not addressed this question at all, but we have given it our most careful consideration. Despite the complexities germinated by the sad condition of the record, we are satisfied that ample notice was imparted here.

■■■ To be sure, as is statutorily demanded, subdivision plats must be

duly recorded in the office of the Surveyor. In our view, however, once that requirement has been met, the statutes do not prohibit an owner from incorporating a revised copy of the same plat into another recordable instrument in order to impress, through a suitable endorsement on the plat, a servitude upon a single lot in the original subdivision. In such circumstances, the revised plat is being used only as a method of imposing a servitude, and not to establish the areas and boundaries of the lots in the subdivision, which is the principal purpose of the filing of a plat in the office of the Surveyor. While, as we shall see, it is true that equitable servitudes can be created by inscriptions on subdivision plats filed with the Surveyor, they may also be created by deeds, with or without plats attached.[54] In fact, it is more customary to establish easements and other land servitudes by deed rather than by the official subdivision plat.

■■■ In this case, the deed conveying title to Morrisette specifically described the parcel under scrutiny as Lot 43 on the plat recorded in the office of the Surveyor. It then referred to that parcel as "comprising the area for car parking as shown on the plat" appended to and recorded with the declaration of covenants.[55] Thus the revised plat was merely being used to indicate that Lot 43 was subject to the parking servitude inscribed thereon. In that posture, resort to the revised plat filed with the Recorder of Deeds was not improper, and Morrisette was placed on notice of the inscription affecting the property he purchased.[56]

part of a particular numbered lot as shown on the plat recorded in the Surveyor's office. The deed to Morrisette identifies its subject as Lot 43 on the latter plat, and refers to it as "comprising the area for car parking as shown on the plat" attached to and recorded with the declaration of covenants in the Recorder of Deed's office.

54. See text *infra* at notes 64–67.

55. See text *supra* at note 8. Compare Smith v. deFreitas, 329 F.2d 629, 633 (3d Cir. 1964); Morton v. Clearview

Homes, Inc., 324 P.2d 543, 545–546 (Okla.1958); McDonald v. Welborn, 220 S.C. 10, 66 S.E.2d 327, 330–331 (1951); Hall v. Church of the Open Bible, 4 Wis. 2d 246, 89 N.W.2d 798, 800 (1958); Dillon v. Davis, 201 Va. 514, 112 S.E.2d 137, 138–140 (1960).

56. Compare Kilby v. Sawtell, 203 Ga. 256, 46 S.E.2d 117, 120, 121 (1948); Crutcher v. Moffett, 205 Ky. 444, 266 S.W. 6, 7 (1924); Recco v. Chesapeake & O. Ry., 127 W.Va. 321, 32 S.E.2d 449, 453–454 (1944).

Beyond the foregoing, Morrisette testified at trial that he had knowledge of the revised plat and of the inscription thereon when he bought Lot 43.[57] Thus, beyond peradventure, Morrisette had actual as well as constructive notice of the inscription, and either was plainly enough.[58] In these circumstances, it is immaterial that the copy of the revised plat bearing the inscription was recorded in the office of the Recorder of Deeds rather than in the office of the Surveyor.[59]

## IV

Since appellee had full notice of the inscription on the copy of the revised subdivision plat pertaining to Lot 43, the issue is reduced to what the subdivider of Dexter Heights might have had in mind in placing it there. The creation of equitable servitudes is basically a matter of intention[60]—not secret, unexpressed thoughts on the matter,[61] we hasten to add, but intention derived from the written language when viewed in the light of the surrounding circumstances.[62] It must appear that the subdivider's object was to create a servitude for parking on Lot 43 which would inure to the benefit of the other lots in Dexter Heights.[63] If such an intention emerges clearly on the record before us, it follows that the District Court erred in ruling in Morrisette's favor.

There can be no question as to the legal sufficiency of an inscription on a plat to impose an equitable servitude on land when the intention to do so is manifest. Servitudes enforceable in equity, no less than other types of property interests, may be created without express grant;[64] even easements, of the

57. Compare University Hills, Inc. v. Patton, 427 F.2d 1094, 1100 (6th Cir. 1970); Library Neighborhood Ass'n v. Goosen, 229 Mich. 89, 201 N.W. 219, 221 (1924); Johnson v. Pattison, Iowa, 185 N.W.2d 790, 797 (1971).

58. See cases cited supra notes 53–56. And the fact that the servitude requires affirmative conduct does not bar suit to enforce observance by Morrisette during his tenure as owner of Lot 43. Murphy v. Kerr, 5 F.2d 908, 910–911, 41 A.L.R. 1359 (8th Cir. 1925); Thew v. Thew, 35 Cal.App.2d 691, 96 P.2d 826, 831 (1939); Everett Factories & Terminal Corp. v. Oldetyme Distillers Corp., 300 Mass. 499, 15 N.E.2d 829, 832–833, 118 A.L.R. 965 (1938). See also Annot., 68 A.L.R.2d 1022 (1959).

59. Compare Perkins v. Jacobs, 124 Me. 347, 129 A. 4, 5 (1925); Library Neighborhood Ass'n v. Goosen, supra note 57, 229 Mich. 89, 201 N.W. at 221. See also Murray v. Klinzing, 64 Conn. 78, 29 A. 244, 245 (1894); Sanborn v. Mueller, 38 Minn. 27, 35 N.W. 666, 667 (1887); Newbold v. Peabody Heights Co., 70 Md. 493, 17A. 372, 373–374 (1889).

60. Gnau v. Kinlein, 217 Md. 43, 141 A.2d 492, 495–496 (1958); Appeal of J. C. Grille, Inc., 181 Pa.Super. 456, 124 A.2d 659, 664 (1956); Ridley v. Haiman, 164 Tenn. 239, 47 S.W.2d 750, 753 (1932); Goodman v. Bingle, 48 S.W.2d 432, 433 (Tex.Civ.App.1932); Cheatham v.

Taylor, supra note 46, 148 Va. 26, 138 S.E. at 549–550.

61. See, e. g., Archer v. Salinas City, 93 Cal. 43, 28 P. 839, 840–841 (1892); Byam v. Kansas City Pub. Serv. Co., 328 Mo. 813, 41 S.W.2d 945, 949–951 (1931). See also cases cited infra note 62.

62. Smith v. Second Church of Christ, 87 Ariz. 400, 351 P.2d 1104, 1109–1112, 84 A.L.R.2d 766 (1960); Leonard v. Osburn, 169 Cal. 157, 146 P. 530, 531 (1914); Gnau v. Kinlein, supra note 60, 217 Md. 43, 141 A.2d at 496–497; Furness v. Sinquett, 60 N.J.Super. 410, 159 A.2d 455, 458 (1960); Byam v. Kansas City Pub. Serv. Co., supra note 61, 328 Mo. 813, 41 S.W.2d at 947–952; Cheatham v. Taylor, supra note 46, 148 Va. 26, 138 S.E. at 549–550.

63. Osius v. Barton, supra note 46, 164 Neb. 99, 147 So. at 862; Clem v. Valentine, supra note 46, 155 Md. 19, 141 A. at 712; Stewart v. Alpert, 262 Mass. 34, 159 N.E. 503, 504 (1928); Toothaker v. Pleasant, 315 Mo. 1239, 288 S.W. 38, 42–44 (1926); Hall v. Risley, 188 Ore. 69, 213 P.2d 818, 831–832 (en banc 1950); Ladner v. Siegel, 294 Pa. 360, 144 A. 271, 273 (1928).

64. Use restrictions on land have frequently been imposed by agreement apart from a conveyance. See, e. g., Clements v. Taylor, 184 S.W.2d 485, 487–488 (Tex. Civ.App.1944). Compare Schefer v. Ball,

nature of which the servitude claimed in this case partakes,[65] may spring up purely by implication.[66] Rights of either character may arise from a plat inscription which, either alone or in conjunction with other objective circumstances, clearly connotes a purpose to lay a burden on land for the benefit of other land.[67]

 We are thus led to a consideration of the trial judge's finding that "the legend on the plat is purely descriptive and was not intended to create an easement or other property rights." [68] Unless clearly erroneous, that finding warranted the adjudication in favor of

Morrisette which Case has subjected to this appeal.[69] But it does not necessarily follow merely from the fact that the inscription "is purely descriptive" that it "was not intended to create . . . property rights" [70] if, when viewed in proper context, it is clearly indicative of an intention to bind Lot 43 as an area for parking by the residents of Dexter Heights.[71] Case argues convincingly that such an intention is plain,[72] while Morrisette responds vigorously that it is nonexistent.[73] Our task thus becomes defined as an appropriate inquiry as to whether, "although there [may be] evidence to support" the finding, "on the

53 Misc. 448, 104 N.Y.S. 1028, 1029–1032, aff'd, 120 App.Div. 880, 105 N.Y.S. 1142 (1907), 192 N.Y. 589, 85 N.E. 1115 (1908). They may also arise by implication. See, e. g., Wing v. Forest Lawn Cemetery Ass'n, 15 Cal.2d 472, 101 P.2d 1099, 1104–1105, 130 A.L.R. 120 (1940); Edwards v. Surratt, 228 S.C. 512, 90 S.E.2d 906, 910–911 (1956); Minner v. City of Lynchburg, 204 Va. 180, 129 S.E.2d 673, 678–680 (1963). They have often arisen from inscriptions and notations on subdivision plats. See note 67, infra, and accompanying text.

65. See Rivera v. Lawton, 35 F.2d 823, 824 (1st Cir. 1929); Cuneo v. Chicago Title & Trust Co., 337 Ill. 589, 169 N.E. 760, 763 (1929); State ex rel. Britton v. Mulloy, 332 Mo. 1107, 61 S.W.2d 741, 743 (1933); Craven County v. First Citizens Bank & Trust Co., 237 N.C. 502, 75 S.E.2d 620, 622–627 (1953).

66. See generally 3 R. Powell, Real Property ¶¶ 410, 411 (rev. ed. 1970).

67. It has been held in numerous cases that a grantee to whom realty is conveyed by reference to a plat acquires a right in the nature of an easement in the areas delineated thereon as spaces for streets, parks and other common uses. See 3 R. Powell, Real Property ¶ 409 (rev. ed. 1970); Annot. 7 A.L.R.2d 607 (1949). It may well be that if all relevant circumstances had been brought forth at trial, this appeal could have easily been disposed of by application of this well established rule. That possibility is foreclosed because title documents in the chain from Dexter Realty Company, the subdivider, to Case are omitted from the record before us. While the record contains the deed to Case and his wife, we cannot determine

whether the rule in question is applicable without examining the other documents in the chain.

68. See note 16, supra.

69. See text supra at notes 25–34.

70. See note 65, supra, and accompanying text.

71. See text supra at notes 43–48.

72. Case's argument is an undifferentiated admixture of legal doctrine drawn from the areas of dedication, estoppel and equitable servitudes. This has hardly promoted clarity of presentation. See 3 R. Powell, Real Property ¶ 409, at 426–427 (rev. ed. 1970). And even assuming an intention to publicly dedicate Lot 43 for parking, there is no basis for resort to the law of dedication because the record nowhere indicates that the District of Columbia has ever accepted Lot 43 as a parking facility. E. g., Watson v. Carver, 27 App.D.C. 555, 559 (1906). Indeed, if a public dedication of Lot 43 for parking had actually occurred, the question under consideration on this appeal would not likely have arisen, for the creation of a right in the general public to park on Lot 43 would have established a fortiori the right of owners in Dexter Heights to use Lot 43 for that purpose. Nor is there any foundation for invoking the doctrine of estoppel since the record shows plainly that Case in no way relied upon or was misled by the revised-plat inscription at the time his parcel was purchased. E. g., Washington Loan & Trust Co. v. Convention of Protestant Episcopal Church, 54 App.D.C. 14, 19, 293 F. 833, 838, 34 A.L.R. 913 (1923).

73. Morrisette's argument largely adopts the trial judge's approach without beneficial embellishment.

entire evidence [we are] left with the definite and firm conviction that a mistake has been committed." [74]

■ Our starting point is the inscription itself.[75] Its wording is simple and direct, and unlike the trial judge [76] we have no difficulty whatsoever in understanding the message it conveys. Lot 43, it says, was "To be Graded & Cinder Covered for Car Parking (50 Cars)," and someone—obviously the subdivider—was to "Provide Proper Driveway Entrance From Talbert Terrace." [77] While we agree that a plat notation of dubious import does not suffice to levy a restriction on land use,[78] we can read this inscription only as an unequivocal declaration that those things would be done in order to enable vehicular parking on Lot 43.[79] And we cannot imagine that parking on Lot 43 for 50 cars was to be arranged for the benefit of any group other than the occupants of Dexter Heights.

So unambiguous is the revised plat inscription in reference to parking on Lot 43 that resort to extrinsic evidence seems hardly necessary.[80] But the fact of the matter is that our reading of the inscription becomes even more persuasive when we examine the surrounding circumstances. Dexter Heights came into being as a community of residential units, initially to be rented to defense workers and later to be sold to veterans returning from the war.[81] As the revised subdivision plat shows, very few of the 89 lots into which Dexter Heights was carved exceed 15 feet in width,[82] and very few abut on any sort of rear alley.[83] There was also a restriction establishing a building setback line only ten feet inwardly from the front lot lines.[84] That combination of circumstances practically removed any possibility of parking vehicles on the individual lots.[85] And from the density of housing construction, resulting largely from the narrowness of the lots, it has been apparent from the beginning that on-street parking was very apt to be woefully inadequate.[86]

Very importantly, the record discloses without contradiction that a condition to the federal financing which the Dexter Heights project utilized was the provision of an area for tenant parking dur-

74. See text *supra* at note 37.

75. See text *supra* at note 7.

76. See note 16, *supra*.

77. See text *supra* at note 7.

78. See, *e. g.*, Holliday v. Sphar, 262 Ky. 45, 89 S.W.2d 327, 329 (1935) ; Moore v. Kimball, 291 Mich. 455, 289 N.W. 213, 215 (1939) ; Single v. Whitmore, 307 N.Y. 575, 122 N.E.2d 918, 922 (1954) ; Cooke v. Kinkead, 179 Okla. 147, 64 P. 2d 682, 684–686 (1936) ; Satterthwait v. Gibbs, 288 Pa. 428, 135 A. 862, 863–864 (1927).

79. Subdivision plat inscriptions far less informative than the one under scrutiny have been held to confer legally protected rights of user upon property owners within the subdivision. See, *e. g.*, Tweedy v. Brennan, 131 F.2d 488, 490 (7th Cir. 1942) ("[b]each") ; Carroll v. Hinchley, 316 Mass. 724, 56 N.E.2d 608, 610 ("[p]ark") ; Weil v. Atlantic Beach Holding Corp., 1 N.Y.2d 20, 150 N.Y.S. 2d 13, 133 N.E.2d 505, 506 (1956) ("[b]oardwalk"). See also Klein v. Dove, 205 Md. 285, 107 A.2d 82, 83–86

(1954) (lake area) ; Cassell v. Reeves, 265 S.W.2d 801, 802–803 (Ky.1954) (unmarked lot) ; Vallone v. City of Cranston, 97 R.I. 248, 197 A.2d 310, 312 (1964) (unmarked strip).

80. See, *e. g.*, Reetz v. Ellis, 279 Ala. 453, 186 So.2d 915, 918 (1966) ; Kent v. Smith, 410 S.W.2d 833, 838 (Tex.Civ. App.1967).

81. See text *supra* at note 2.

82. Thus it was impossible to construct a driveway past the residential unit on such a narrow lot.

83. Only nine of the 89 lots in the subdivision have access to a rear alley.

84. This restriction is set both by markings on the revised subdivision plat and by provisions of the declaration of covenants.

85. We take judicial notice of the amount of space which the parking of a vehicle requires.

86. Case's testimony at trial portrays vividly the trouble he has had in finding on-street parking near his residence.

ing the era it was to serve the housing needs of defense workers. The only inference tolerable in this milieu is that the inscription on the revised plat regarding Lot 43 was designed to satisfy that requirement.[87] We think, too, that the inference is inevitable that the inscription was designed to benefit not only the World War II tenants but also the post-war owners of the properties comprising Dexter Heights. That is demonstrated by a series of documents recorded long prior to the end of the war, as we now explain.

The revised subdivision plat is far different from a plan depicting merely the sites of housing units to be erected, which is all a project exclusively for rental would have required. It is a layout of 89 separate lots, accompanied by specification of all the data essential to exact location of the boundaries of each. Indeed, the only feature of the revised plat tending in the least to indicate the location of any dwelling unit to be constructed is the building setback line drawn thereon. The revised plat thus served plainly the cause of future sales of the individual properties comprising Dexter Heights.

Moreover, the pre-construction agreement to supply separate water and sewer services for each lot and to bring party walls into conformity with building code requirements clearly looked forward to the day when the lots in Dexter Heights would be individually sold as improved properties.[88] In like fashion, the pre-development declaration of covenants imposing a cluster of mutual restrictions on all lots in the subdivision just as clearly envisioned the day when renting would yield to selling.[89] But despite the emphatic showing that from the inception of Dexter Heights the lots were slated for eventual sale to veterans, the record contains not so much as an inkling that the benefits of the parking that Lot 43 was undeniably to furnish to tenants immediately were not also to extend to the lot owners who were to follow them.

 We are mindful that, as the trial judge pointed out,[90] the declaration of covenants did not mention a parking servitude on Lot 43. That is not surprising since the declaration on its face was directed toward restrictions that would bind and benefit all lots reciprocally, in contrast to a parking servitude which would burden only one lot without any return from any of the rest. But whatever the explanation, this circumstance carries too little weight to impinge upon the several positive identifications that Lot 43's burden was to be every other lot's benefit. The omission can be accounted for by any one of a number of innocuous reasons, and no basis for assuming anything different is apparent. We cannot attribute to it an importance that would threaten the strong showing made by other indubitable features of the case. Furthermore, the declaration recites that "[a]ll the . . . lots [are] more fully designated and shown on plat attached hereto and made a part hereof and to which reference is hereby made. . . ."[91] It is settled that such an incorporation by reference summons a reading of the declaration and the revised plat appended as a single instrument.[92]

---

87. Indeed, the fact inferable was confirmed by the uncontroverted testimony of a former officer of Dexter Realty Company, the subdivider. This witness, referring to the inscription, stated that "I know that the language was to set that lot aside as off-street parking for the defense rental clients, tenants."

88. See note 6, *supra*.

89. See text *supra* at notes 3–4.

90. See note 16, *supra*.

91. See note 5, *supra*.

92. George v. Manhattan Land & Fruit Co., 51 F.2d 28, 31 (5th Cir. 1931); Johnston v. Thomas, 275 F.Supp. 32, 35 (S.D. Ohio 1967); Nixon v. City of Anniston, 219 Ala. 219, 121 So. 514, 516 (1929); Kraemer v. Kraemer, 167 Cal. App.2d 291, 334 P.2d 675, 681–682 (1959); Harris v. Griffith, Miss., 210 So. 2d 629, 633 (1968); Lowe v. Ragland, 156 Tex. 504, 297 S.W.2d 668, 672, 673 (1957).

Nor are we able to accept the trial judge's conclusion that because Lot 43 has never been used or fit for parking, no equitable servitude binding it to that purpose arose.[93] We do not consider any more significant the fact, noted by the judge,[94] that Dexter Heights' property owners have never before pressed a claim that Lot 43 should be made useable for parking of their vehicles. Events transpiring after activities assertedly creating a property interest have no bearing on the question whether the asserted interest arose.[95] Put another way, a parking servitude on Lot 43 either arose or failed to arise when the inscription referring to that lot was incorporated into the revised subdivision plat. Moreover, mere acquiescence in the violation of a restriction does not amount to an abandonment as long as it retains some value,[96] nor does nonuser work an abandonment of a nonprescriptive easement when unaccompanied by clear evidence of an intention to abandon.[97] And since Morrisette testified at trial that he plans to make Lot 43 suitable for parking by others than Dexter Heights residents, it is apparent that the lot possesses no physical characteristics rendering its development for that use unfeasible. In sum, the circumstances which the trial judge found per-

suasive neither prevented the servitude from coming into being nor, without more, wrought its termination.

This is not to say that these circumstances when coupled with others of similar character could not have caused a loss of the right to enforce the servitude after it arose. It is to say that the trial judge made no finding which would support that conclusion. The judge ruled that no enforceable servitude on Lot 43 emanated from the revised plat inscription in reference to that lot. Consequently, he had no occasion to focus on the question whether subsequent events destroyed the right to bring a violation to task by injunction. Since, "on the entire evidence," we are "left with the definite and firm conviction that a mistake has been committed,"[98] we deem it "just under the circumstances"[99] to leave the door open to litigation of Morrisette's defenses. The District Court will be free to determine on remand whether enforcement of the servitude on Lot 43 would now be inequitable. It goes without saying that we intimate no view whatsoever in that regard.

The judgment appealed from is reversed, and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.

Reversed and remanded.

93. See note 16, *supra.*

94. See note 16, *supra.*

95. See, however, text *infra* at notes 96–97.

96. Beeler Dev. Co. v. Dickens, 254 Iowa 1029, 120 N.W.2d 414, 418 (1963); Deitrick v. Leadbetter, 175 Va. 170, 8 S.E.2d 276, 278–279, 127 A.L.R. 849 (1940). Nor does mere lapse of time establish laches. *E. g.,* Dollar v. Land, 87 U.S.App.D.C. 214, 226, 184 F.2d 245, 257, cert. denied, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641 (1950); United States ex rel. Givens v. Work, 56 App.D.C. 330, 332, 13 F.2d 302, 304, cert. denied,

273 U.S. 711, 47 S.Ct. 101, 71 L.Ed. 853 (1926).

97. Brunthaver v. Talty, 31 App.D.C. 134, 137 (1908); Smith v. deFreitas, *supra* note 55, 329 F.2d at 634; Finn v. Williams, 376 Ill. 95, 33 N.E.2d 226, 228, 133 A.L.R. 1390 (1941); Klein v. Dove, *supra* note 79, 205 Md. 285, 107 A.2d at 85–87; Delconte v. Salloum, 336 Mass. 184, 143 N.E.2d 210, 213, 214 (1957); Miller v. Teer, 220 N.C. 605, 18 S.E.2d 173, 177–178 (1942).

98. See text *supra* at note 37.

99. See 28 U.S.C. § 2106 (1970).